**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Karen MOUTRY, Defendant–Appellant.**

No. 93–2919.

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 4, 1994.

Decided Jan. 18, 1995.

Melanie Conour, Asst. U.S. Atty., Donna Eide (argued), Office of U.S. Atty., Indianapolis, IN, for plaintiff-appellee.

William J. Conroy, Jr., Cantrall, IL (argued), for defendant-appellant.

Before BAUER, KANNE, and ROVNER, Circuit Judges.

KANNE, Circuit Judge.

Karen Moutry and her male friend Thirl Chavis, together with a number of other persons, consumed and dispensed cocaine on Indianapolis' northwest side. Moutry and Chavis were both charged and convicted of conspiracy to distribute and distribution of cocaine and possession with intent to distribute cocaine. On appeal Moutry raises several issues, including alleged violations of the Speedy Trial Act, prejudicial remarks made by a potential juror, insufficiency of the evidence, and ineffective assistance of counsel.

## I.

Moutry (together with Chavis) went to trial on May 4, 1993, 197 days after Chavis first appeared in court on October 19, 1992. The Speedy Trial Act provides that, absent various enumerated reasons for delay, criminal defendants must go to trial within seventy days of the first appearance of the last co-defendant to appear. 18 U.S.C. § 3161(c)(1). Moutry claims that the court erred in not dismissing her indictment because she was not tried within the time required by the Speedy Trial Act.[1]

The Speedy Trial Act excludes various periods of time from the seventy day limit. The court may properly exclude time for any period of "delay resulting from any pre-trial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion." Any period "resulting from the absence or unavailability of the defendant or an essential witness" is also excludable. And the court may exclude any period resulting from a continuance granted by the judge on his or either party's motion if the ends of justice served by the continuance outweigh the interest of the public and the defendant in a speedy trial. 18 U.S.C. § 3161(h)(1)(F), (3)(A), (8)(A).

To obtain a reversal of the district court's granting of a continuance under the Speedy Trial Act, Moutry must demonstrate that the court either committed a legal error or

abused its discretion. *United States v. Jean,* 25 F.3d 588, 594 (7th Cir.1994). Where there is no legal error, we will reverse only if there is both an abuse of discretion and actual prejudice. *Id.*

As mentioned, the speedy trial clock began to run on October 19, 1992. Trial was initially set for November 18, 1992, but the district court reset the date to December 14 on its own motion. After the initial trial date was set, the following events delayed the commencement of the case.

The government moved on November 9 to continue the December 14 trial date, citing Assistant United States Attorney ("AUSA") Melanie Conour's plans to be out of the country. On November 12 Judge McKinney reset the trial for January 19, 1993. The government filed on December 30 a second motion to continue, stating that DEA Agent Casey, an essential witness, was unavailable for trial and trial preparation because he had committed his time to other criminal trials in January 1993. The motion also averred that AUSA Conour would be involved with another trial on February 8, 1993. The government requested a continuance until February 22, 1993. Judge McKinney granted the government's motion on January 5, 1993.

Moutry requested new counsel on February 10, 1993; the court granted her request on February 17, 1993. The court recognized that new counsel would require additional time to prepare for trial; accordingly, Judge McKinney reset trial for May 3, 1993. The court, on its own motion, subsequently pushed the trial back one day to May 4, 1993.

The district court excluded from the speedy trial calculation the time for the government's motions to continue. Specifically, the court excluded time from the government's motion, November 9, 1992, to the second trial date, January 19, 1993. The court also excluded time for the second motion from December 30, 1992, to the third trial date, February 22, 1993. These two exclusions, without counting overlap, total

1. Actually, Moutry did not formally move the court to dismiss the charges against her. She did, however, articulate to the court her concern that she be brought more speedily to trial. She

proceeded *pro se* at that point, though she had counsel throughout most of the proceeding. We will treat her claim under the Speedy Trial Act as though she has preserved it properly.

105 days. Assuming this time was properly excluded, only 92 days of countable time lay between Chavis' first appearance (which started the speedy trial clock running for both him and Moutry) and the trial. The request for new counsel made on February 10 was granted on February 19 and continued the trial until May 3. If properly excluded, that is another 73 days subtracted from the speedy trial clock, leaving 19 days of unexcluded time, well within the Speedy Trial Act's seventy day limit.

However, Moutry contends that the district court erred when it excluded the time for the government's continuances from the speedy trial calculation. She believes that the court should not have allowed AUSA Conour's schedule to interrupt the proceedings and that DEA Agent Casey was not an essential witness whose unavailability should have been allowed to delay the trial.

█ Further, she disputes that Judge McKinney made a proper record of his reasons for finding that the ends of justice that would be achieved in excluding the time outweighed Moutry's and the public's best interests in a speedy trial. The record, however, reveals that Judge McKinney made exactly such a finding with respect to each of the government's motions to continue. Judge McKinney cited on the record that the interests of justice required that the government have adequate time to prepare its necessary and material unavailable witness and that it be able to maintain continuity of counsel. The witness in question is Agent Casey, the DEA agent who investigated Moutry. He testified about the details of his investigation, details that helped place Moutry in the midst of the cocaine conspiracy. And, as the Speedy Trial Act specifically provides that continuity of counsel is an acceptable basis for an "ends of justice" exclusion of time, we find the district court's record acceptable regarding AUSA Conour's absence. We find no abuse of discretion in the district court's findings relevant to these exclusions.

█ The district court essentially acted *sua sponte* regarding the continuance that followed Moutry's request for new counsel. Although the court did not explicitly exclude the time for this continuance from the speedy trial calculation, Moutry did not suffer any prejudice from the ensuing delay. In fact, she gained an advantage from the delay to the extent that her new counsel utilized the extra time to prepare for her trial. The record shows that the district court had Moutry's best interests in mind when it continued the trial, and, as the government points out, the continuance preserved Moutry's right to effective assistance of counsel. Therefore, we will subtract the time for this continuance from the total number of days that elapsed before trial. 18 U.S.C. § 3161(h)(8)(A) & (B)iv; *see United States v. Davenport*, 935 F.2d 1223, 1235 (11th Cir.1991) (holding that time needed for defendant's new counsel to prepare is properly excluded from speedy trial calculations where the defendant moved for a continuance).

Only nineteen days of unexcluded time elapsed between Chavis' initial appearance and his and Moutry's trial. Thus, Moutry's Speedy Trial Act rights were not violated.

Moutry argues that the district court improperly granted the government's continuances in *ex parte* proceedings. There was no *ex parte* hearing. The record establishes that the government served Moutry with its motions by certified mail the same day it filed them. Moutry did not file objections to the motions. The district court granted the first motion in three days and granted the second in five days. Both were granted without a hearing on the basis of the written motion (and the lack of objection). We find no error in the district court's proceeding as it did in granting the government's motions to continue.

## II.

█ Moutry alleges that the district court denied her an impartial jury when it did not strike the entire jury venire after one potential juror made a prejudicial remark about Moutry in front of all the other potential jurors. Moutry did not raise the issue in the district court, so we review the allegation concerning prejudice occurring during the court's voir dire for plain error. *United States v. Adcox*, 19 F.3d 290, 293 (7th Cir. 1994). We will reverse Moutry's conviction

only if we find that, in light of the entire record, the juror's comments during voir dire probably influenced the finding of guilt. *United States v. Andrus,* 775 F.2d 825, 852 (7th Cir.1985).

During voir dire, Alvin King, a pharmacist in a Kroger store in Indianapolis, advised the court that he thought he recognized Moutry as someone who might have attempted to pass a fraudulent prescription in one of the pharmacies where he worked. Prior to the following colloquy, the court had questioned potential jurors about their general feelings concerning drug use and the fact that both defendants (Moutry and Chavis) were black.

MR. ALVIN KING: That is going to have a direct effect on me, Judge, because in my profession, which I am a pharmacist, I work all over this city since about '61, at various drug stores, and I come in contact with all kinds of people and those who, you know, deal with illicit drugs and those who try to get drugs by false prescription, et cetera. And I'm on record as being one of the guys who has reported people trying to use fraudulent prescriptions. As a matter of fact, I was scheduled to go to court last year on a case.

But as looking at these people, this lady looks familiar. Not that I have been in her company where she has, you know, was dealing but the people you read off on the list of witnesses I wouldn't know people by name, but I know them by sight and I come in contact with a lot of individuals.

THE COURT: You are concerned that because you have seen so many folks that you are liable to see somebody that you know and—

MR. KING: Correct. And I don't want to be unfair to people that I might know who I do know use drugs. I don't want to offend these people the chance of having a fair trial.

THE COURT: Your are not concerned—

MR. KING: I don't know those people at all.

THE COURT: But you are concerned about the fact that you might have known somebody?

MR. KING: The lady looks familiar. You know, me being black, I know most of you say we look like each other, but that is not true. But I have many friends, all kinds of friends: white and black, users and non-users.

But the contents of my heart comes from the Scripture. My wisdom comes from God.

But I have got to be honest, that I associate with all kinds of people.

THE COURT: So your concern is you think you can't be fair in this case?

MR. KING: No, no. That has nothing to do with it. I am going to be fair whatever I do, whatever decision I make.

But I don't want to be a reflection on anyone that I might know that might walk up here.

THE COURT: But you didn't recognize—

MR. KING: Oh, I don't know them by name. I know a lot of people but I don't know them by name, personally.

THE COURT: Well, I recognize your concern, Mr. King, and I am going to let you stay with us for awhile. I hear you tell me that you can be fair and impartial in this and I appreciate that.

\*     \*     \*     \*     \*     \*

THE COURT: Now Mr. King, you and I have developed a certain relationship here. You work at Kroger's as a pharmacist?

MR. KING: Right.

THE COURT: Do you enjoy that work?

MR. KING: By all means, yes.

THE COURT: What kind of things do you and your family do on vacation, Mr. King?

MR. KING: Well, previously, before my wife was deceased last year, we go south. My home is in Mobile, Alabama. Her home in New Orleans. We visit family. We go to our relatives and enjoy short hospitalities.

THE COURT: Do you have any hobby?

MR. KING: I love golf.

THE COURT: How often do you get out to play?

MR. KING: Well, the first time this year. My wife last year was real sick. She was

in the hospital five months and she passed. So I guess I will play more this year.

THE COURT: Do you have any questions you'd like to ask me?

MR. KING: No. I am quite comfortable.

THE COURT: Do you think of any reason why you could not serve as a fair and impartial juror?

MR. KING: No. I love the Lord and I know he loves justice and that is what I am for.

THE COURT: Thank you very much.

\*    \*    \*    \*    \*    \*

King remained a potential juror awhile longer, but one of the parties eventually struck his name from the venire (the record does not reflect whether it was the government or one of the defendants or whether the strike was for cause or peremptory). Juror King's observations were hedged and made in such a way as to limit any damaging effect they might have had. In any event, given the substantial evidence in the case, we cannot say that they were so prejudicial as to meet the standard called for in plain error review, that the comments probably influenced the finding of guilt.

■ Moreover, after King commented about possibly recognizing Moutry, Judge McKinney inquired of each juror whether he or she could consider the case fairly and impartially. Each responded affirmatively. There is nothing to indicate that any one of the jurors was less than truthful about his or her ability to be fair and impartial, or that any of the jurors otherwise harbored a prejudice against Moutry. Absent any reasons to suspect as untrue the jurors' claims of ability to remain impartial despite exposure to an improper third party comment, the court should credit those responses. *United States v. York,* 933 F.2d 1343, 1367 (7th Cir.1991), *cert. denied,* 502 U.S. 916, 112 S.Ct. 321, 116 L.Ed.2d 262 (1991). We credit them accordingly and find no error in empaneling the jury in this case.

### III.

■ Moutry argues that the government provided insufficient evidence to support her convictions and her sentence. However, she failed to preserve those issues by moving the district court for a judgment of acquittal or for a new trial. We may review her conviction for plain error only. *United States v. South,* 28 F.3d 619, 626 (7th Cir.1994) (collecting cases). She also did not raise any objections to the presentence report. Therefore, we review the sentencing record for plain error as well. *United States v. Livingston,* 936 F.2d 333, 336 (7th Cir.1991), *cert. denied,* 502 U.S. 1036, 112 S.Ct. 884, 116 L.Ed.2d 787 (1992). We will not reweigh evidence; we will not determine the credibility of the witnesses. We won't even resolve doubts in favor of Moutry. *United States v. Cooper,* 19 F.3d 1154, 1164 (7th Cir.1994). We will, however, examine errors so rife with injustice that to allow Moutry's conviction and sentence to stand would be to mock the Constitution's guarantee of a right to a fair trial.

■ Moutry directs us to no such errors. She asks us to reweigh evidence and to evaluate the credibility of witnesses, tasks that lie outside our province. *Id.* The government charged Moutry with both substantive cocaine offenses and with conspiracy. Section 841 of Title 21 of the United States Code requires the government to prove that Moutry knowingly or intentionally dispensed or possessed with intent to dispense a controlled substance. To prove that Moutry conspired to commit a felony, the government must prove that Moutry agreed with at least one other person to commit a felony. 21 U.S.C. § 846. The government need not, as the Supreme Court has recently concluded in connection with § 846, aver or prove the commission of an overt act in furtherance of the conspiracy. *United States v. Shabani,* —— U.S. ——, 115 S.Ct. 382, 130 L.Ed.2d 225 (1994); *see also United States v. Maholias,* 985 F.2d 869, 874 (7th Cir.1993). But "[t]o prove that a particular defendant was a member of an ongoing conspiracy, the government must present 'substantial evidence that [the] defendant knew of the illegal objective of the conspiracy and agreed to participate in its achievement.'" *United States v. James,* 40 F.3d 850, 865 (7th Cir.1994) (quoting *United States v. Burrell,* 963 F.2d 976,

987 (7th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 357, 121 L.Ed.2d 270 (1992)).

■ The record shows that the government presented witnesses, including Catherine Siakotos and Phil Fogel, who testified that Moutry conspired with Siakotos and Chavis to use and distribute cocaine on several occasions and that Moutry in fact possessed and distributed those quantities. For example, Siakotos testified that, during his first trip to Indianapolis, Chavis brought Moutry and Siakotos cocaine and cocaine paraphernalia, such as free-basing pipes. During this first trip, Moutry told Siakotos that she was going to sell some of the fifteen or sixteen ounces of cocaine that Chavis had brought with him and that they would sell for $900 an ounce. She wondered whether Siakotos knew anyone who would buy them, and Siakotos recruited customers. Chavis brought another fifteen or sixteen ounces of cocaine with him the second trip, Siakotos testified, and Moutry also distributed some of that supply. On Chavis' third trip to Indianapolis, Moutry set up an apartment and telephone service for herself and Chavis. During this third trip, Moutry delivered cocaine from Chavis to Siakotos for her to sell, telling her that she (Siakotos) was a front for distributing seventeen ounces of Chavis' cocaine.

Phil Fogel testified that he bought cocaine from Moutry on several occasions from the time he met her in 1988 until August 1989 and that through Moutry he got some of the cocaine Chavis brought to Indianapolis. He also testified that Chavis gave him some cocaine without charge because he had helped Moutry distribute cocaine to various customers. This evidence is sufficient to support a finding that Moutry's conduct fulfilled all the elements of the crimes with which she was charged. Moutry testified that she did not conspire or participate in Chavis' cocaine ring, but the jury believed the other witnesses and convicted her. We not only find no plain error in this case, we also find the jury's verdict reasonable based on the evidence in the record.

The district court, hearing no objection from Moutry, adopted the government's presentence report that calculated Moutry to be responsible for over 500 grams of cocaine. The report was based upon the testimony of Siakotos and Fogel. Again, we will not judge their credibility.

■ Siakotos testified that Chavis brought at least fifteen ounces of cocaine with him during each of his first two trips to Indianapolis. Fogel testified that Chavis brought even more cocaine with him during his third trip. Thirty ounces equals much more than 500 grams, as the government points out.[2] Five hundred grams is the amount required for Moutry to receive the mandatory minimum of five years, which increased to ten years upon the district court's finding that Moutry had been previously convicted of a felony drug offense. 21 U.S.C. § 841(b)(1)(B)(ii).

■ It was permissible for the district court to find that Moutry was responsible for all of Chavis' cocaine because she knew it existed, helped to distribute at least some of it, and could reasonably foresee the distribution of the entire lot. *See United States v. Savage,* 891 F.2d 145, 151 (7th Cir.1989) (holding that "The amount of narcotics considered in sentencing for conspiracy includes not only the amount involved in the transactions that were known to the defendant but also those that were reasonably foreseeable.") Finding no error in the district court's attribution of all of Chavis' cocaine to Moutry, we decline to set aside the court's findings.

### IV.

■ Moutry claims that her lawyers afforded her constitutionally ineffective assistance of counsel. In reviewing such claims, we presume that counsel exercised reasonable professional judgment in making all significant decisions and otherwise rendered adequate assistance. *United States v. Herrera–Rivera,* 25 F.3d 491, 495 (7th Cir.1994)

---

**2.** One ounce equals approximately 28.3 grams, so thirty ounces equals approximately 849 grams.

(citation omitted). In order to overcome this presumption, Moutry must show both that her attorneys' representation fell below an objective standard of reasonableness and that but for her attorneys' inadequate performance the outcome of the proceeding would have been different. *Id.*

Moutry must identify specific acts or omissions of her attorneys (there were two, one replaced the other at her request) that were not objectively reasonable. *Id.* Moutry claims that her trial lawyers performed incompetently by failing to pursue her speedy trial claims. As Moutry had no valid speedy trial claims, the outcome of the case would have been no different had. her attorneys pursued those claims more diligently. So, this is not a viable ground upon which to claim ineffective assistance of counsel. *Id.*

Moutry alleges that her trial counsel improperly allowed the prosecutor to discuss and argue evidence that the court had refused to admit. She refers to the court's ostensible ruling that a former Dillon Inn General Manager did not qualify as a witness that could identify Dillon Inn records. The trial transcript reflects the district court saying "This man can't identify these records," but the " 't" in "can't" may be a typographical error.

■ In fact, the prosecutor continued to examine the witness after the court ruled and Moutry's lawyer made no objection. This strengthens the inference that the judge actually authorized the manager to testify regarding the records. However, even if the district court had excluded the testimony concerning the hotel records, that Moutry's lawyers did not raise follow-up objections does not rise to the level of constitutional ineffectiveness. The Dillon Inn records provided nothing more than corroboration of Siakotos' testimony that Moutry, Siakotos, and Chavis met at the Dillon Inn on more than one occasion.[3] Other evidence more convincingly establishes Moutry's guilt. Therefore, even if Moutry's lawyer's conduct regarding the Dillon Inn records fell outside the acceptable range of effective advocacy,

the result had no probable impact on Moutry's conviction. Thus, her counsel was not constitutionally ineffective.

■ Moutry also claims that her trial counsel was ineffective in that he submitted no instructions, made no *Batson* record (that is, a record that would establish whether jurors had been improperly stricken for race based on *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986)), filed no pretrial motions or motions for acquittal, prepared no trial briefs in opposition to the government's motions, and made almost no objections at trial. Moutry, however, does not demonstrate that her attorney pursued an unreasonable trial strategy in not filing various motions or making more objections. We will not question counsel's choices among an array of reasonable trial strategies. *See United States v. Rush,* 890 F.2d 45, 51 (7th Cir.1989) (noting that the court will not second-guess counsel's reasonable tactical decisions.)

Moutry does not indicate which instructions her attorneys should have contested or what sorts of instructions they should have submitted; she does not specify which jurors the prosecution struck improperly in violation of *Batson;* she does not describe what motions or objections counsel should have made. As we find nothing egregious in any of the government's motions, the decision of Moutry's attorneys not to file briefs in opposition to them is not error. And the evidence against Moutry was so compelling that moving for a judgment of acquittal would have been fruitless. Such a motion would have better preserved Moutry's claim, but we would not find in her favor even if we were to scrutinize the reasonability of the jurors in reviewing the sufficiency of the evidence.

In short, there was no apparent reason for her counsel to do any of the things Moutry suggests. Moutry's claims amount to no more than second-guessing her trial counsel. We will not do the same absent more demonstrable evidence of unreasonableness.

**3.** Siakotos had testified earlier in the trial that she, Chavis, and Moutry met at the Dillon Inn to

consume and parcel cocaine.

Moutry's remaining claims are without merit.

AFFIRMED.