**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Lynard JOINER and James E. Collins,
also known as Duke, Defendants–
Appellants.**

**Nos. 97–1170, 97–2190.**

United States Court of Appeals,
Seventh Circuit.

Argued May 12, 1998.

Decided July 1, 1999.

David E. Risley, Stephen A. Kubiatowski (argued), Office of the United States Attorney, Springfield, IL, for Plaintiff–Appellee.

Carol J. Reid (argued), Springfield, IL, for Defendant–Appellant in No. 97–1170.

Ellen L. Partridge (argued), Partridge & Niro, P.C., Chicago, IL, for Defendant– Appellant in No. 97–2190.

Before COFFEY, EASTERBROOK and ROVNER, Circuit Judges.

COFFEY, Circuit Judge.

On November 29, 1995, a grand jury charged six persons, including defendants-appellants Lynard Joiner ("Lynard" or "Joiner") and James Collins ("Collins"), with conspiracy to distribute cocaine and cocaine base. Joiner and Collins were also charged with distribution of a controlled substance and possession of a controlled substance with intent to distribute, in vio-

lation of 21 U.S.C. § 841(a)(1), and employment of a juvenile in a drug offense, in violation of 21 U.S.C. § 861(a)(1).

After Joiner and Collins entered into separate, negotiated plea agreements, they were sentenced to 235 months' and 360 months' imprisonment, respectively. On appeal, the defendants challenge the district judge's determination regarding the amount and type of drugs attributable to them, as well as the conclusion that they exercised a managerial or supervisory role in the conspiracy. In addition, Collins challenges the use of a previous conviction to enhance his sentence and claims ineffective assistance of counsel. We affirm.

## I. BACKGROUND

Joiner, his father, Richard Joiner, Sr., and his brothers, Richard Jr., Willie, and Robert, sold marijuana and powder cocaine out of their home in Springfield, Illinois. By 1988, the Joiner family dominated a section of Springfield's drug market, with Lynard and Willie frequently pooling their money to buy cocaine from various sources.

In late 1991, Lynard set out to establish his own, independent presence in the Springfield narcotics market. Toward that end, Lynard would cook cocaine into crack, package it into one-sixteenth ounce bags, and then distribute it, either selling it himself or utilizing several of his associates. Lynard attempted to expand his growing drug business by recruiting Calvin Sanders, who in September 1991 commenced selling crack for Lynard on a regular basis, and defendant-appellant Collins, who was a sixteen-year-old high school student. Collins, in turn, convinced a fellow student, identified in the record only

as Confidential Informant # 5, to join the conspiracy.

At the time Joiner formed his own operation, he purchased approximately one-quarter kilogram of cocaine powder at a time from his cousin in Chicago, Jerald Sanders, who received his cocaine from McKinley Hayden, a leader in the Chicago branch of The Gangster Disciples.[1] With the expansion of his business, Joiner gradually increased this amount until it reached two or more kilograms per trip.[2]

In March of 1992, after Joiner's relationship with Jerald Sanders deteriorated, Collins commenced dealing with Sanders directly. Presumably because of his more direct access to a drug supplier, Collins began developing his own dominion within the Springfield drug world by regularly purchasing five to eighteen ounces of powder cocaine. In a few short months, however, he was up to more than one kilogram per week.

By October of 1993, Collins had solidified his position as the main cocaine supplier in Springfield. In addition to his own sales, he built up a network of several distributors, including Calvin Sanders, who sold an average of eight one-sixteenth ounce packages of crack per day, and Michael and Terry Wilson.[3]

In 1993, Collins, apparently recognizing the perilous nature of narcotics dealing, stated to an accomplice that in the future he was going to restrict himself to selling only powder cocaine because he was worried about the "Feds." Unfortunately for Collins, he lacked the resolution to follow through with his conviction, and continued to sell Michael Wilson approximately one-quarter ounce of crack every four days. Additionally, Collins was responsible for

---

1. The record does not reveal whether Jerald Sanders was related to Calvin Sanders, who was mentioned previously.

2. The record is silent as to how frequent the trips were, only revealing that sometimes Jerald Sanders delivered the cocaine to Spring-

field, and other times Joiner, accompanied by his associates, would travel to Chicago.

3. Just as the record does not reveal whether Calvin and Jerald Sanders are related, it is also silent as to whether Michael and Terry Wilson are related.

the sale of crack to others, albeit on a more limited scale.

On November 7, 1995, an agent of the Drug Enforcement Administration ("DEA") filed a criminal complaint charging Joiner and Collins, along with Willie Joiner, Jerald Sanders, William Bradley, and Michael Wilson, with knowingly and intentionally conspiring to distribute cocaine and cocaine base in Springfield, Illinois, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), and 846. The complaint was based on a 167–page affidavit from DEA Task Force Agent, Bruce Harmening, which summarized the government's investigation into the conspiracy.[4] Included in the affidavit were personal observations of Harmening and other law enforcement agents, as well as statements to the police by the defendants, their accomplices, various named witnesses, and eight confidential informants. On the same day the complaint was filed, Joiner and Collins, as well as the other named defendants, were arrested. On November 29, 1995, the same defendants were charged by indictment, which repeated the conspiracy charge, and further charged Joiner and Collins with distribution of a controlled substance and possession of a controlled substance with intent to distribute, in violation of 21 U.S.C. § 841(a)(1), and employment of a juvenile in a drug offense, in violation of 21 U.S.C. § 861(a)(1).

Five of the six defendants (Willie Joiner, Jerald Sanders, William Bradley, Collins, and Michael Wilson) accepted the prosecutor's written offer of use immunity. Joiner, however, declined the government's offer, yet still agreed to be interviewed by government agents. In the interview, Joiner stated that he began purchasing cocaine from Jerald Sanders in late 1991; that Calvin Sanders sold cocaine for him; that after his 1992 argument with Sanders he turned to Collins as his drug source; and that Collins, Sanders, and Bradley assaulted him in late 1994 over a drug debt.

On April 22, 1996, Joiner changed his plea to guilty pursuant to a plea agreement that made no mention of use immunity. At the change of plea hearing, the prosecutor informed the court, without objection from defense counsel, that a cooperation and use immunity agreement had been offered to Joiner but that Joiner had declined to sign it.

After Joiner pled guilty, government agents again interviewed him. In the second interview, Joiner added a detail he had omitted earlier, namely, that beginning in late 1992, he cooked two ounces of crack for Collins every one and one-half weeks.

Attempting to reach the best deal for himself, Collins entered into a plea agreement on May 6, 1996. Pursuant to the agreement, Collins pled guilty to conspiracy to distribute cocaine and expressly waived his right to appeal on any ground other than "the amount and type of drugs for which he [would be] held accountable as relevant conduct under the Sentencing Guidelines."

The Pre–Sentence Investigation Reports ("PSRs") for both Joiner and Collins largely tracked the affidavit which had served as the foundation for both the complaint and the indictment, and also contained the agents' reports of the second interview with Joiner. Joiner raised several objections to the PSR, including the PSR's conclusion that he acted as a manager or supervisor of the conspiracy, as well as the recommendation that he should be held accountable for 1.5 kilograms of crack cocaine during the course of the drug conspiracy. The court overruled his objections, finding that the record supported the PSR's conclusions as to the drug amounts and Joiner's status as a manager or supervisor of the conspiracy. On January 14, 1997, after finding Joiner's total

---

4. A number of governmental agencies cooperated in the investigation, including the Illinois State Police, the Sangamon County Sheriff's Office, the Springfield Police Department, the Chicago Police Department, and the Federal Bureau of Investigation.

offense level to be 38, the judge sentenced him to 235 months' incarceration.

Collins also raised several objections to his PSR, arguing among other things that the PSR incorrectly concluded that the conspiracy involved more than 1.5 kilograms of crack cocaine. At Collins' sentencing hearing, defense counsel argued that Collins was responsible only for the 400 grams of crack he personally sold over the course of the conspiracy, as well as the seven kilograms of powder cocaine he purchased from Jerald Sanders. Collins took the position that he should not be held accountable for the actions of his co-conspirators, Michael and Terry Wilson, who purchased powder cocaine from Collins and converted it into crack and sold it. Defense counsel conceded that if Collins were held accountable for the crack distributed by the Wilsons, Collins would be responsible for 1.3 kilograms of crack. The court, in a written order, found that the crack distributed by Terry and Michael Wilson was not only reasonably foreseeable to Collins but was actually known to him, and held Collins responsible for 1.3 kilograms of crack. The court found Collins' total offense level to be 40, assigned him a criminal history category of IV, and imposed a sentence of 360 months' imprisonment.

## II. ISSUES

On appeal, both defendants allege that the trial court committed error: (1) in its findings regarding the drug type and amounts for which they were accountable; and (2) in its determination that the defendants played a managerial or supervisory role in the conspiracy. Collins also argues that the district court erred in using his 1994 state drug conviction to enhance his sentence because his prior conviction was not obtained by indictment. Finally, Collins argues that he was denied the effective assistance of counsel.

## III. ANALYSIS

### A. *Drug Type and Amounts*

 Both Joiner and Collins challenge the district court's determination regarding the type and quantity of drugs attributable to them. The government maintains that the record supports the district court's factual findings regarding the drugs. We review the trial court's findings for clear error. *See United States v. Earnest*, 129 F.3d 906, 914 (7th Cir.1997).

At a sentencing hearing, the government is required to establish, by a preponderance of the evidence, the type and amount of drugs attributable to the defendants. *See United States v. Miner*, 127 F.3d 610, 613 (7th Cir.1997). Although drug amounts and types cannot be determined by mere speculation, reasonable estimations are permissible. *See United States v. Jarrett*, 133 F.3d 519, 530 (7th Cir.1998) ("Courts should indeed proceed cautiously when making quantity determinations, but the Sentencing Guidelines do not allow courts to blind themselves to a large-scale drug conspiracy's activities over a long period of time."). With this in mind, we will reverse the district court's calculation of the quantity of drugs involved only if we have a "firm and definite conviction that a mistake has been made." *Miner*, 127 F.3d at 614–15 (internal quotations omitted). "The task on appeal is not to see whether there is any view of the evidence that might undercut the district court's finding; it is to see whether there is any evidence in the record to support the finding." *United States v. Wade*, 114 F.3d 103, 105 (7th Cir.), *cert. denied*, —— U.S. ——, 118 S.Ct. 238, 139 L.Ed.2d 169 (1997).

### 1. *Joiner*

Basing his determination in part on Joiner's admission to Task Force Agent Bruce Harmening that he cooked two ounces (56.7 grams) of cocaine into crack for Collins every two weeks for approximately a year and a half, the district judge found that 1.5 kilograms of crack were

attributable to Joiner even though, as the judge noted, the sum total of this activity would produce 2.21 kilograms of crack. The trial judge also relied upon the statement of one of Joiner's associates, Bruce Green, who asserted that he observed Joiner cook one-quarter kilogram of cocaine into crack in April 1992. Finally, another witness, identified only as Confidential Informant # 4, advised authorities that he assisted Joiner in cooking two kilograms of cocaine at an unspecified date during the course of the conspiracy. These two witnesses independently provide a nexus between Joiner and 2.25 kilograms of crack cocaine.

■ Joiner argues that his admission and the statements of Green and Confidential Informant # 4 merely connect him with the *cooking* of crack cocaine and not with the *sale* of these drugs; according to Joiner, since he did not actually sell the crack, he should not be held responsible for it. Joiner's argument is unavailing because "a conspirator [is] responsible for the amount of drugs that an individual conspirator actually distributes, *as well as for any quantity distributed by the conspiracy that was reasonably foreseeable to the conspirator.*" *United States v. McEntire,* 153 F.3d 424, 438 (7th Cir.1998) (emphasis added). "The government need not tie a conspirator to each transaction so long as the conspirator could reasonably foresee that the transactions would occur." *Id.* Following *McEntire,* the fact that Joiner cooked crack cocaine for sale by any member of the conspiracy enabled the trial court to hold him responsible for it.

■ Because Joiner himself admitted cooking 2.21 kilograms of cocaine into crack, and since other witnesses stated that Joiner cooked at least 2.25 kilograms into crack, we cannot say the district court's conservative determination of 1.5 kilograms was clearly erroneous.

■■ Joiner also argues that he should have received immunity for any statements he made after he signed a plea agreement

and while he was cooperating with the government. According to Joiner, because his admission that he cooked crack for Collins came after he signed the agreement, the government should be prohibited from using his concession against him. As Joiner raises this argument for the first time on appeal, we review it for plain error. *See United States v. Hicks,* 129 F.3d 376, 378 (7th Cir.1997).

Use immunity is governed by U.S.S.G. § 1B1.8(a), which states:

> Where a defendant agrees to cooperate with the government by providing information concerning unlawful activities of others, and as part of that cooperation agreement the government agrees that self-incriminating information provided pursuant to the agreement will not be used against the defendant, then such information shall not be used in determining the applicable guideline range, except to the extent provided in the agreement.

Under this section, a defendant receives immunity for his self-incriminating statements if the government agrees to grant immunity. Joiner, however, *turned down the government's offer of use immunity,* a point which Joiner's own counsel conceded at oral argument. Thus, Joiner has fallen far short of establishing that he was entitled to immunity for any statements made after he signed the plea agreement. Furthermore, even if the judge were *not* entitled to consider Joiner's admission, he still would have been able to rely upon the statements of Green and Confidential Informant # 4, who connected Joiner to 2.25 kilograms of crack cocaine. Accordingly, even if Joiner's own admission was excluded, the record contains more than an adequate basis for affirming the judge's conclusion.

#### 2. *Collins*

■ The sentencing court found that Collins was responsible for the distribution of 1.3 kilograms of crack. The judge arrived at this quantity through defense

counsel's own admission at the sentencing hearing that Collins could be held accountable for the distribution of 1.3 kilograms of crack cocaine:

> Collins' counsel: "[T]he ultimate numbers are that again, 7 kilograms of cocaine purchased during the conspiracy...."
>
> The Court: "That's powder?"
>
> Collins' counsel: "Powder, yes, Your Honor. For which my client is responsible, with 1.3 kilos of powder converted to crack cocaine."
>
> . . . . .
>
> Collins' counsel: "On the high end, and the absolute high end, we suggest that it's the least reliable; is that there were 7 kilograms of cocaine with at most 1.3 kilos of powder converted to crack...."

Collins was present at the sentencing hearing and did not object to the above statements of his counsel. Defense counsel's admission was founded in part on Collins' own admission that he sold 400 grams of crack cocaine; the remainder of the 1.3 kilograms stemmed from Collins' knowledge that his co-conspirators, Michael and Terry Wilson, converted much of the cocaine they purchased from him into crack. *See* U.S.S.G. § 1B1.3(a)(1)(B) (relevant conduct includes, among other things, "in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity."). In addition to Collins' own admission, the record contains the statement by Joiner that he cooked two ounces of powder into crack for Collins every two weeks for approxi-

mately two years, which independently accounts for as much as 2.21 kilograms.

Considering that Collins' counsel conceded that the record supported a finding that Collins was responsible for 1.3 kilograms of crack cocaine, and the statements of Joiner, Michael Wilson, Terry Wilson, and Collins himself, which demonstrate that Collins was involved in the distribution of at least this amount, the trial judge had more than a sufficient basis for attributing 1.3 kilograms of crack cocaine to Collins.

 In an attempt to avoid this obvious conclusion, Collins argues that since the plea agreement he entered into with the government specifically referred to *cocaine* and not to *crack*, the government violated the plea agreement when it informed the sentencing judge that Collins trafficked in *crack*. Because of Collins' failure to raise this objection before the sentencing court, we review this claim for plain error. *See Hicks,* 129 F.3d at 378.

 "The government must fulfill any promise that it expressly or impliedly makes in exchange for a defendant's guilty plea." *United States v. Ingram,* 979 F.2d 1179, 1184 (7th Cir.1992). Nonetheless, as with a contract, a party's rights under a plea agreement are limited by what the parties in fact agreed to. *See United States v. Jimenez,* 992 F.2d 131, 134 (7th Cir.1993) (citing *United States v. Benchimol,* 471 U.S. 453, 105 S.Ct. 2103, 85 L.Ed.2d 462 (1985) (per curiam) and *United States v. Verrusio,* 803 F.2d 885, 889 n. 3 (7th Cir.1986)).

 Collins' plea agreement contains nineteen paragraphs, six of which (¶¶ 10–15) delineate the government's obligations. These six relevant paragraphs do not make any mention of the government agreeing to refrain from informing the court that Collins trafficked in crack,[5] nor can such an obligation on the part of the

---

5. In ¶¶ 10–15, the government agreed "to dismiss counts 6–9 of the indictment" (¶ 10) and "to recommend a sentence of imprisonment no greater than the low end of the applicable Sentencing Guideline range" (¶ 11); agreed that Collins had been cooperating with the

government be found in any other section of the agreement. Indeed, it would have been beyond the government's power to even *make* such a promise, since a prosecutor has an obligation to inform the court of all relevant conduct. *See, e.g., United States v. Schilling*, 142 F.3d 388, 395 n. 11 (7th Cir.1998) ("the very nature of the sentencing process precludes an attorney for the Government promising to withhold relevant information from the sentencing court"), citing *United States v. Cook*, 668 F.2d 317, 320 n. 4 (7th Cir.1982). *See also United States v. Block*, 660 F.2d 1086, 1091–92 (5th Cir.1981) (a government agreement to withhold relevant facts from the court would "not only violate[ ] a prosecutor's duty to the court but would result in sentences based upon incomplete facts or factual inaccuracies, a notion that is simply abhorrent in our legal system."). Any argument that the judge erred in considering the relevant conduct is equally meritless. As the Supreme Court stated in *Edwards v. United States*, 523 U.S. 511, 118 S.Ct. 1475, 1477, 140 L.Ed.2d 703 (1998), the sentencing judge has

> to determine the total amount of drugs, determine whether the drugs consisted of cocaine, crack or both, and determine the total amount of each—regardless of whether the judge believed that petitioners' crack-related conduct was part of the "offense of conviction," or the judge believed that it was "part of the same course of conduct, or common scheme or plan." The Guidelines sentencing range—on either belief—is identical.

As obvious as it is that the government could not have legally entered into such an agreement, it is more obvious that it did not. The only section of the plea agreement which is arguably relevant to this issue is ¶ 17, which states that Collins "reserves the right at sentencing to contest,

among other things … whether he is liable for any amount of crack …." If Collins believed the government was agreeing to ignore its legal responsibilities, then ¶ 17 would be unnecessary. Its inclusion makes this court comfortable in concluding that Collins knew that the government would be submitting evidence about Collins' involvement with crack. Accordingly, Collins has failed to point us to any language in the agreement which could be construed as being breached.

### B. *Manager or Supervisor*

#### 1. *Joiner*

 Joiner also alleges that the court erred in finding that he acted as a manager or supervisor in the conspiracy. We review such a claim to determine whether the district court's finding is clearly erroneous. *See United States v. Wilson*, 134 F.3d 855, 870 (7th Cir.1998); *United States v. Spillman*, 924 F.2d 721, 723 (7th Cir.1991).

 A sentencing judge's authority to depart upward where the defendant acted as a manager or supervisor of a conspiracy derives from U.S.S.G. § 3B1.1, which states:

> Based on the defendant's role in the offense, increase the offense level as follows:
>
> (a) If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels.
>
> (b) If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by 3 levels.

government and that if he continued to do so he would be eligible for an acceptance of responsibility reduction, pursuant to U.S.S.G. § 3E1.1 (¶ 12); agreed that the defendant qualified for a one-level reduction in offense level for agreeing to plead guilty before the government was forced to expend resources on trial preparation (¶ 13); agreed that the

government would inform the court of "the nature, extent, and value of any cooperation rendered by the defendant" (¶ 14); and stated that the government reserved the right, at its sole discretion, to move for a downward departure "if the defendant provides substantial assistance in the investigation or prosecution of other criminal offenses" (¶ 15).

As before, the government bears the burden of establishing, by a preponderance of the evidence, facts which justify an upward adjustment of a defendant's offense level. *See Miner,* 127 F.3d at 613.

Joiner does not challenge the fact that the conspiracy involved five or more persons; his claim rests on his contention that he was not a manager or supervisor of the conspiracy. The government, maintaining that Joiner did play such a role, relies on several factors: (1) according to Calvin Sanders, starting in September 1991 he sold crack cocaine for Joiner on a regular basis, usually operating out of Joiner's van; (2) Calvin Sanders, Debra Pool, Bruce Green, Terry Wilson, and James Collins all confirmed that Collins sold crack for Joiner, at least until Joiner had his falling out with Jerald Sanders; (3) Pool and a confidential informant both stated that another person, named Tully Graham, also sold cocaine for Joiner; (4) Bruce Green stated that he cooked crack for Joiner in 1991 and began selling crack for him in January 1992; (5) Terry Wilson said that he sold crack for Joiner in the summer of 1992; and (6) according to Pool, a person named Frankie Rollin sold cocaine for Joiner.

Given the extensive evidence demonstrating Joiner's control over his accomplices, we conclude that the court's determination that Joiner was a manager/supervisor was not clearly erroneous. Thus, we affirm the three-level enhancement in his sentence.

### 2. *Collins*

■ Collins also attempts to challenge the judge's finding that he played a managerial role in the conspiracy, but in his plea agreement Collins specifically waived his right to appeal any issue besides the amount and quantity of drugs attributable to him. The judge specifically discussed Collins' waiver with him during his Fed. R.Crim.P. 11 change of plea hearing:

THE COURT: [Y]ou are ... waiving your right to appeal the sentence that I impose, as is set forth in Paragraph 86 [sic—should be "8"] of your plea agreement. And as noted in Paragraph 9, the only exception to that would be if you disagree on the issue of the amount of drugs for which you are to be held accountable as relevant conduct under the Sentencing Guidelines.

In other words, you are waiving your right to appeal any sentence that the Court imposes, except you are reserving the right to contest the finding of this Court as to the issue of the amount of drugs that you're held accountable for as relevant conduct.

Because Collins does not contend on appeal that his plea agreement was involuntary, we deem his appeal waived. *See United States v. Wenger,* 58 F.3d 280, 282 (7th Cir.1995) ("If the [plea] agreement is voluntary, and taken in compliance with Rule 11, then the waiver of appeals must be honored.").

### C. *Collins' Previous Drug Conviction*

On appeal, Collins also argues that his previous drug-related conviction was erroneously used for enhancement purposes. As stated above, Collins waived his right to appeal any issue other than the amount and type of drugs he would be held accountable for, and we must honor that waiver. *See id.*

### D. *Ineffective Assistance*

■ In an attempt to avoid the waiver barrier, Collins asserts that he received ineffective assistance of counsel because "[i]t is not clear that [he] understood that the plea meant that the government no longer had to prove the amount and kind of drugs beyond a reasonable doubt and that the burden on the prosecution at sentencing would be less."

■ Although the defendant does not cite it, in *Jones v. United States,* 167 F.3d 1142 (7th Cir.1999) we held that the waiver of a right to appeal does not completely foreclose review, because the right to appeal survives where the agreement to waive is involuntary or where the trial

judge relied on a constitutionally impermissible factor (like race) or where the sentence exceeds the statutory maximum. Collins' claim of ineffective assistance of counsel does not fall within the narrow confines of *Jones*. Accordingly, the garden-variety attacks on his sentence he wants to raise, in the guise of a claim of ineffective assistance of counsel, are exactly the sort of claims he knowingly and intelligently waived his right to present by proceeding as he did in the district court.

## CONCLUSION

The record more than adequately supports the trial judge's finding regarding the quantity and type of drugs attributable to the defendants, as well as his determination that Joiner acted as manager or supervisor of the conspiracy with which he was charged. By entering into his negotiated plea agreement, Collins waived the right to appeal any of the other issues he now seeks to raise. Accordingly, the judgments and sentences of the district court are AFFIRMED.